IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09-4050-01-CR-C-NKL |
| | ) | |
| PAUL WESLEY STRANGE, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Before this court is the December 15, 2010 motion of defendant Paul Wesley Strange to suppress all evidence and testimony concerning items recovered from a search of 4718 Elnor Drive, Russellville, Cole County, Missouri, and any statements made by the defendant in relation to the search. Defendant claims he did not execute a valid consent to search his residence where officers located and seized, among other evidence, a Smith and Wesson .38 caliber revolver. The Government has filed a brief in opposition and defendant responded with a reply in support. A hearing was held on the motion on March 8, 2011.

### Facts

In September 2009, the Morgan County Sheriff's Department was conducting an investigation into the passing of counterfeit currency in its jurisdiction. During this investigation, a vehicle, bearing a Missouri license plate, registered to Vikki Strange (hereinafter Vikki), was identified and believed to be used by people involved in the counterfeiting scheme. Morgan County investigators were interested in making contact with the owner of the vehicle, Vikki, whose vehicle registration showed she lived in Cole County, Missouri. Morgan County officers contacted the law enforcement officers in Cole County where Vikki lived. When talking with the Cole County officers, the Morgan County officers were told that Vikki had previously cooperated with local law enforcement in the Jefferson City area as a paid confidential informant.

On September 14, 2009, officers met with Vikki and officers from the Morgan County and Cole County Sheriffs' Departments, and the Jefferson City Police Department. During this

meeting, Vikki explained what she believed to be the extent of the counterfeiting, and implicated her brother (the defendant), his girlfriend, Rhonda Curtis, and Adam Edmonds. Vikki admitted she may have passed some of the counterfeit bills, but claimed she wasn't aware at the time that they were counterfeit.[1] Vikki agreed to allow officers to search her residence at 3708-D Randall Drive in Jefferson City, Cole County, Missouri. Officers agreed to conduct the search in such a way that it would not alert the other individuals that she was cooperating with law enforcement.

On this same date, the officers went to Vikki's residence at 3708-D Randall Drive. There was no answer when the officer knocked on the door, but subsequently Vikki drove up in a vehicle while the officers were there. In the vehicle with Vikki were Adam Edmonds, and Rhonda Curtis. Vikki, Edmonds and Curtis got out of the vehicle. The officers asked Vikki if she would consent to the search of her residence, to which Vikki responded affirmatively that she would consent. Edmonds, who was outside the residence, gave the officers consent to search his person, and officers found counterfeit bills on his person. Edmonds was arrested. Curtis also consented to a search of her person and her purse. No contraband was found, and Curtis, who was the driver of the vehicle, was told she was free to leave. Vikki was handcuffed by the officers as a pretext to protect her from being identified as cooperating with the officers, but she was never actually arrested or taken into custody. While searching inside Vikki's residence, the officers located counterfeit bills and counterfeiting tools.

Edmonds was transported by officers to the Cole County Jail. As officers concluded the investigation at Vikki's residence, Vikki approached Cole County Sheriff's Detective Petty and told him that her mother had called and stated she had received a call from Curtis. Vikki told the officers that Curtis told Vikki's mother to go the residence that Curtis shared with the defendant off Rock House Road and get the printer and the "thing between the mattress." Based on this information, Detective Petty was concerned that additional evidence of counterfeiting was located at the defendant's residence. Detective Petty asked Vikki what was between the mattress and she told him that she had called her mother back, and that Curtis had told Vikki's mother that

---

[1]The officers at no time told Vikki she was going to be arrested. An officer testified that she may have been told that they had probable cause to arrest her, but she was clearly told that she was not going to be arrested.

someone else was at defendant's residence "unloading everything." Detective Petty asked Vikki what the address of her brother's trailer was, to which Vikki stated she did not know exactly, but indicated it was off Rock House Road.

Detective Petty located defendant's residence off Rock Hill Road at 4718 Elnor Lane, Russellville, Missouri. Already at the residence were other law enforcement officers who had been notified that evidence of counterfeiting might be in the process of being removed from the residence. Defendant's vehicle was at the residence. Neither defendant nor Curtis appeared to be there.

After arriving at the residence, the officers attempted to verify that the residence belonged to the defendant and Curtis, and discussed the possibility of seeking a state search warrant. Vikki subsequently pulled up to the residence with an individual believed to be her son, Brian. Vikki stated she had received a telephone call from the defendant, telling her to get his dog from his residence because he wasn't coming home for awhile. The officers allowed Brian to enter and get the dog. The officers asked Vikki what she thought was inside. Vikki offered to go in and look around. The officers (specifically Detective Petty) declined this offer, stating that they could not direct her to go inside the residence without having a warrant or consent to search from defendant.

At some point, shortly after Vikki's arrival at defendant's residence, Vikki approached Cole County Sheriff's Detective Murdick with her cell phone, saying that her mother was on the line, and was concerned that Vikki was being arrested. Detective Murdick spoke with a woman on Vikki's cell phone who identified herself as Vikki's mother. Detective Murdick assured Vikki's mother that Vikki was not being arrested.

While Vikki was talking to Detective Petty outside defendant's residence, her cell phone kept ringing. Detective Petty told her she could answer her own phone as she was not under arrest. When Vikki answered her phone, she stepped away from the officers in order to hold her conversation. The officers could hear her talking, but state they were not really listening to her conversation because they were discussing issues related to whether they should obtain a search warrant. The officers did overhear enough of the conversation to determine that it was defendant talking to Vikki and that Vikki was telling him that she and their mother were going to jail if he

3

didn't give the officers consent to search his residence. At one point, Detective Petty told Vikki that her statements were untrue. Vikki said, "I know." The officers had not directed Vikki to contact defendant or to say anything to him.

Shortly after taking the call on her cell phone from defendant, Vikki walked up to Detective Petty and handed him her phone, stating that defendant wanted to speak with him. Detective Petty asked who he was speaking to and the man identified himself as Paul Strange, the defendant. Detective Petty starting talking to the defendant for awhile, while trying to get an audio recording set up. After the audio recording was working, Detective Petty recorded defendant's consent to the search of his residence and necessary information from defendant in order to confirm his identity and that he was the owner of the residence with authority to give consent. During the conversation with defendant, Detective Petty did not tell defendant the information he overheard Vikki giving him earlier, about she and their mother being arrested, was untrue.

Upon receiving the recorded consent from defendant to search his residence, the officers entered to search. Vikki, who stated she had a key to the residence, stood at the front door in case the key was needed. The front door was not locked. After the officers entered, Vikki was allowed to enter. The officers testified that Vikki sat on the couch inside defendant's residence during the search. While inside the residence, Vikki advised the officers on where to search for the evidence. After initially searching the house and finding 20-gauge shotgun shells, a printer, marijuana pipes and other drug paraphernalia, but not finding evidence of counterfeit bills or a gun, Detective Petty approached Vikki and told her he thought she was lying. Vikki responded that the counterfeit bills were supposed to be in the silverware drawer in the kitchen, and that the gun was in the bedroom. The officers were able to locate the gun, a Smith &Wesson .38 caliber revolver with ammunition, but did not find the counterfeit bills.[2]

---

[2]There are some discrepancies between the facts testified to by law enforcement and those facts indicated in the recording of the second phone conversation, which was submitted into evidence. Because the recording was made contemporaneously with the incident, this court believes that the recording more accurately reflects what actually occurred. The testimony of law enforcement officers is based upon their recollection of an incident which occurred approximately one and one-half years ago.

Vikki subsequently, on her own initiative, took the recording device the officers had used earlier, and called her brother, the defendant, again. This second conversation was recorded. Vikki made the call while she was in defendant's residence, and while the officers were still searching the residence. During this second conversation, Vikki continued with false assertions about being arrested in an attempt to get defendant to identify the location of counterfeit evidence in his residence. Vikki is heard saying during the phone conversation that law enforcement were not allowing her to leave and that they were going "to take me (Vikki) and my mom" because they were not finding the counterfeit paper they were looking for in the residence. Vikki tells defendant that they already found the gun, the printer, and are now looking for the paper money. Vikki states, "They want the paper money or I'm going to jail." Defendant then attempts to confirm Vikki's statement about the gun being located, asking, "They found the gun?" Vikki responds, "What are you doing with that mother f_____"? Defendant replies, "Being a bad boy, making sure I'm safe." Vikki then continues to tell defendant they can't find the money. Vikki insists that defendant needs to "think harder" and remember where the counterfeit money was located in his residence. Defendant again states that the money is under the silverware tray in the silverware drawer. Vikki tells defendant, "I've looked under there." Vikki says "Hang on, I'm walking over here," and can be heard riffling through what sounds to be defendant's silverware drawer, stating to defendant, "I'm in your drawer right now, I've lifted up the whole drawer, the whole tray, there is nothing, . . . , nowhere." Defendant responds that he knows that is where the money was. Vikki continues, "It is not in there I promise you, they are not letting me leave at all," and states that her son Brian and defendant's dog are outside waiting for her. Vikki says, "They got to have the paper or I'm going to jail and mom's going to jail . . . ." Vikki tells defendant that law enforcement is "standing here staring at me, they can't hear you though." Defendant ends the conversation by saying to Vikki that the paper (money) "is gone," and then hangs up. The counterfeit money that Vikki was trying to locate was not found.

Officers concede they saw Vikki on her cell phone with the recording device as they were processing the evidence from the residence, and did overhear at least part of her conversation with defendant. However, the officers had not asked Vikki to make the call, had not asked Vikki to use the recording device, and did not speak with the defendant. Again, Vikki knew she and

her mother would not be arrested. No one ever told Vikki that she or her mother would be held or arrested if the officers did not find what they were looking for in defendant's residence. However, Vikki likely knew that her cooperation could become relevant to whether any charges were subsequently filed against her.

While at the scene, Vikki gave a written statement to police indicating what had happened. In this statement, she stated:

> I got a phone call from my mom that she was told by Rhonda 2 go clean out the house. I told her don't go, I would go get the dog & dog food. When I pulled up cops everywhere they want to check Paul's house. I couldn't let them so they were going to take me and my mom to jail on something. Paul called and said get everything out of there, then talked to the cops and told them they have the right to go in.

Vikki admitted to the officers that her statement was a lie, and that she made the statement because she didn't want defendant to know she was cooperating with law enforcement.

## Discussion

"It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is per se unreasonable subject only to a few specifically established and well-delineated exceptions. It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). This is the issue in this case -- whether the defendant voluntarily consented to the search of his residence.

## Agency

To determine the voluntariness of defendant's consent to the search of his residence, the court must first determine whether defendant's sister, Vikki, who helped law enforcement obtain defendant's consent, was an agent of the law enforcement officers.

> Although the Fourth Amendment does not apply to a search or seizure, even an arbitrary one, effected by a private party on his own initiative, the amendment protects against such intrusion if the private party acted as an instrument or agent of the government. . . . Whether a private party should be deemed an agent or instrument of the government for Fourth Amendment purposes necessarily turns on the degree of the government's participation in the private party's activities, a question that can only be resolved in light of all the circumstances.

6

United States v. Wiest, 596 F.3d 906, 910 (8th Cir. 2010) (quoting Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 604 (1989)). "In considering whether conduct of a private citizen is subject to the Fourth Amendment, our court considers 'whether the government had knowledge of, or acquiesced in the intrusive conduct; whether the citizen intended to assist law enforcement or instead acted to further his own purposes; and whether the citizen acted at the government's request.' " Wiest at 910 (quoting United States v. Inman, 558 F.3d 742, 745 (8th Cir. 2009).

In this case, Vikki's actions and words indicate she intended to help law enforcement. Vikki offered information to law enforcement without it being requested; showed up at defendant's residence, despite no request by law enforcement; offered to go in defendant's residence and search for law enforcement; took the initiative to convince defendant to give law enforcement consent to search his residence by giving false information about her and her mother being arrested if he did not consent; entered with police and helped search; and made another phone call to defendant using law enforcement equipment seeking the exact location of the counterfeit money. Although Vikki was not a paid confidential informant in this case, she was acting like one, and was clearly intent on helping law enforcement.

Despite her intention to assist law enforcement, the evidence is clear that law enforcement did not request Vikki's assistance beyond her initial grant of consent to search her residence. There is no dispute that law enforcement did not make any requests or suggestions to Vikki asking her to help in obtaining defendant's consent to search his residence, or in obtaining information as to the exact location of evidence in his residence.

However, regardless of law enforcement's lack of request that Vikki assist them, the evidence shows they acquiesced in her actions and the statements. Law enforcement concedes they were aware of the misrepresentations Vikki made to defendant about she and their mother being arrested if law enforcement did not get what they were looking for. These misrepresentations were made by Vikki in both conversations she had with defendant. Law enforcement also concedes they took no action to correct these misrepresentations. The consent and information given by defendant in both phone conversations were given immediately after her statements.

Vikki was allowed in the residence during the search and actively participated in it. She was allowed to use law enforcement recording equipment to record the second phone call which resulted in incriminating statements. She was actively engaged in the search and obtaining consent, using police equipment, making false assertions to assist law enforcement. She was an agent of the government.

## **Whether Consent was Voluntary**

The Fourth and Fourteenth Amendments require that the Government demonstrate by a preponderance of the evidence that Strange's consent was, in fact, voluntarily given, and not the result of duress or coercion, express or implied. Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973); United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990). Voluntariness is a question of fact to be determined from the totality of the circumstances in a particular case, which includes both the characteristics of the accused, and the details surrounding his giving consent.

Relevant characteristics of the person giving consent are (1) age; (2) general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent; and (5) whether because they had been previously arrested, they were aware of the protections afforded to suspects. Id. at 381.

Here, Strange does not challenge consent based on any of the above personal characteristics. Rather, Strange challenges consent based only on grounds that the environment in which his consent was given was coercive. When examining the environment in which a defendant's consent is given, the courts have set out some basic guidelines. In applying these guidelines in this case, the relevant issues are: (1) whether Strange was detained or questioned for a long period of time; (2) whether Strange was threatened, physically intimidated, or punished by the police; (3) did Strange rely upon promises or misrepresentation made by the police; (4) was Strange in custody or under arrest when consent was given; (5) was Strange's consent given in a public or a secluded place; and (6) did Strange object to the search or stand by silently while the search occurred. Id.

The credible facts as presented at the detention hearing show that Strange was not detained or in custody at the time he gave consent. Strange's consent for law enforcement to search his residence was given to law enforcement over the phone. The phone conversation between Strange and law enforcement was recorded, and there is no evidence that defendant was threatened by law enforcement. The tone of the phone conversation sounds to be cordial in nature. Strange was not at his residence or present with law enforcement when he gave his consent; therefore, the environmental factors regarding whether he was in a public or secluded place when he gave consent, or whether he objected to the search or stood by silently while the search occurred, are not relevant. The only environmental factor at issue in this case is whether the misrepresentations by his sister Vikki, who (as set forth above) was acting as an agent for law enforcement, made his consent involuntary.

The Government has the burden of showing, by a preponderance of the evidence, that a defendant's consent to search was voluntary and not based on misrepresentations. Chaidez at 380. See also Lego v. Twomey, 404 U.S. 477 (1972) (preponderance of the evidence is the standard of review to be applied in suppression hearing admissibility rulings); Bumper v. North Carolina, 391 U.S. 543, 547 (1968) ("When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given"). To meet their burden, the Government must show that the consent was "the product of an essentially free and unconstrained choice by its maker, . . ., rather than the product of duress or coercion, express or implied." Chaidez at 380. This determination depends on the totality of circumstances. Id. "A confession or a consent to search is voluntary unless, in light of all the circumstances, pressures exerted upon the suspect have overborne his will." United States v. Magness, 69 F.3d 872, 874 (8th Cir. 1995).

Here, the undisputed evidence set forth at the hearing shows that during the first phone conversation defendant had with his sister, Vikki, she made misrepresentations to defendant, stating that she and their mother would be arrested if defendant did not give the officers consent to search his residence. Law enforcement concedes that they were aware of these misrepresentations. The misrepresentations were made over the phone just prior to Vikki handing her phone to the officers. When the officers received the phone from Vikki, defendant

9

was still on the line, and he gave the officers his consent for them to search his residence. While talking with defendant on Vikki's phone, law enforcement said nothing to correct the misrepresentations that they had just heard Vikki making to him. Nor did defendant, at any time in the conversation with law enforcement, indicate why he was consenting to the search. It seems unlikely Vikki would keep making the same statements about going to jail if she did not think it was necessary to get the consent.

As set forth above, Vikki was an agent of law enforcement, and therefore, her statements made to defendant are considered to be that of law enforcement, regardless of the intent or lack of intent by law enforcement. Vikki's statements to defendant that she and their mother would be arrested if he did not give his consent to the search of his residence were coercive statements being made by law enforcement in order to obtain defendant's consent.

While this court cannot know exactly why defendant consented or if his will was, in fact, overborne, because he did not testify at the suppression hearing, his testimony is not ultimately necessary because the Government carries the burden of showing his consent was voluntary. Here, the Government has failed to come forward with evidence that the inherently coercive statements by Vikki did not lead to his consent. Law enforcement never attempted to clarify or correct the misrepresentations made by their agent. The Government has failed to come forward with evidence sufficient to show, by a preponderance of the evidence, that defendant's consent was the product of his essentially free and unconstrained choice, rather than the result of the coercive misrepresentations made by an agent of law enforcement.[3] Cf: Magness at 874 (without evidence of coercive police conduct, consent was voluntary).

---

[3] The court believes this case is distinguishable from United States v. Bradley, 234 F.3d 363 (8th Cir. 2000), cited by the Government. The Bradley case involved facts in which the defendant alleged that the officer threatened him with the arrest of his son if he did not consent to the search. The court held that regardless of the alleged threat, the evidence did not establish that defendant acted under duress or undue pressure. In the instant case, the facts establish circumstances of duress and undue pressure. Vikki, an agent of the law enforcement, used coercive misrepresentations during a telephone conversation with defendant to convince him to give law enforcement consent to search his residence; the conversation resulted in defendant telling law enforcement they could search his residence. The Government in this case has failed to meet its burden of establishing, by a preponderance of the evidence, that defendant's consent was given voluntarily.

Based on the totality of the circumstances, this court finds that the Government has not proved the consent was voluntary, and any evidence resulting from the search of Strange's residence should be suppressed.

## Statements

Defendant also seeks to suppress statements he made during the second phone conversation he had with Vikki. This second conversation occurred while his residence was being searched and was also recorded.

Violations of the Fourth Amendment mandate a broad application of the "fruits" doctrine that requires exclusion as "fruit of the poisonous tree" of evidence discovered as a result of an unconstitutional search. Oregon v. Elstad, 470 U.S. 298, 305-06 (1985). "The purpose of the Fourth Amendment exclusionary rule is to deter unreasonable searches, no matter how probative their fruits." Id. at 306. Here, as set forth above, the search of defendant's residence violated his rights under the Fourth Amendment. Moreover, there were no intervening factors to break the causal connection between the previous coercive statements resulting in defendant's original consent to search and defendant's subsequent statements made in the second phone conversation during which he identified where in the residence the counterfeit evidence was located and made statements about the gun found at his residence. See Id. (prosecution must show sufficient break in events to undermine inference that confession was caused by Fourth Amendment violation). Without removal of the causal connection, or "taint," defendant's statements made during the second phone conversation are fruit of the poisonous tree. Moreover, during this second phone conversation, Vikki made additional repeated coercive statements. Vikki continued to tell defendant that she and their mother would be arrested if the officers did not find what they were looking for in his residence.

Therefore, this court finds that the statements made by defendant during a second phone conversation with Vikki in which defendant identified the location of counterfeit money and made statements about the gun found in his residence, were tainted by the first phone conversation and were acquired with misrepresentations of an agent of law enforcement. As such, these statements should be suppressed fruit of the poisonous tree.

## Conclusion

Based on the foregoing,

IT IS RECOMMENDED that defendant Strange's motion to suppress evidence and statements be granted and the evidence and statements resulting from the search of Strange's residence be suppressed. [21]

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections. A failure to file and serve exceptions by this date shall bar an attack on appeal of the factual findings in the Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

Dated this 26th day of April, 2011, at Jefferson City, Missouri.

/s/ *William A. Knox*

WILLIAM A. KNOX
United States Magistrate Judge